AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  23-SW-282 |
| A BLACK SAMSUNG PHONE CURRENTLY LOCATED AT | ) | |
| 601 4TH STREET NW, WASHINGTON, DC UNDER RULE 41 | ) | |
| | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference)

Located within the jurisdiction of the District of Columbia, there is now concealed  *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC § 2252(a)(2) - Sexual Exploitation of a Minor. | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's  signature*

Kelly McLeod, Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

Telephone _____ *(specify reliable electronic means).*

Date:  _____8/30/2023_____

*Judge's signature*

City and state:  _____Washington, D.C._____

Zia M. Faruqui

(United States Magistrate Judge)

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☑ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.   23-SW-282 |
| A BLACK SAMSUNG PHONE CURRENTLY LOCATED AT | ) | |
| 601 4TH STREET NW, WASHINGTON, DC UNDER RULE 41 | ) | |
| | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located within the jurisdiction of the District of Columbia.
*(identify the person or describe the property to be searched and give its location)*:

See Attachment  A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____September 12, 2023_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Zia M. Faruqui_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____8/30/2023_____            _____
                                                                          *Judge's signature*

City and state: _____Washington, D.C._____            Zia M. Faruqui
                                                                     United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>23-SW-282 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*


Zia M. Faruqui

## ATTACHMENT A

### *Property to be Searched*

The property to be searched is a black in color Samsung cellular phone with SIM card, IMEI:

356044290542610, that was seized from JOHN ALBERTSON upon his arrest on August 23,

2023 in Hebron, Kentucky, hereinafter the "DEVICE". While powered on, the DEVICE display

shows an image of a man wearing a white baseball cap backwards, and a brown-colored dog on a

leash. The DEVICE was taken into FBI custody and is currently located at the Federal Bureau of

Investigation's Washington Field Office located at 601 4th St NW Washington, DC 20535.



## ATTACHMENT B

*Property to be Seized*

The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 USC § 2252(a)(2), as described in the search warrant affidavit, including, but not limited to:

    a. Records and information relating to child pornography, child erotica, and visual depictions of minors engaged in sexually explicit conduct;

    b. Records and information constituting evidence of the intent or attempted intent to travel for the purpose of engaging in sexual activity with a minor or the coercion and enticement of a minor;

    c. Records and information constituting evidence of the intent or attempted intent to transport a minor for the purpose of engaging in sexual activity with a minor or the coercion and enticement of a minor;

    d. Records and information constituting evidence of or pertaining to a sexual interest in children or the intent to engage in sexual activities with a minor, including:

        i. Communications involving the enticement or attempted enticement of a minor;

        ii. Communications involving the receipt or distribution of child pornography or child erotica;

        iii. Communications involving the advertising of child pornography or child erotica;

        iv. Communications involving travel or attempted plans or preparation to travel with the intent to engage in sexual activities with a minor;

e. Information, correspondence, records, documents or other materials constituting evidence of or pertaining to items "a" through "d" above (including child pornography, child erotica, and visual depictions of minors engaged in sexually explicit conduct), or constituting evidence of or pertaining to the possession, receipt, distribution, or transmission through interstate or foreign commerce of items "a" and "b" above, or constituting evidence of or pertaining to a sexual interest in children or the intent to engage in sexual activity with children, including:

    i. Correspondence or communications, such as electronic mail, chat logs, and electronic messages, including over applications;

    ii. Internet usage records, user names, logins, passwords, e-mail addresses and identities assumed for the purposes of communication on the Internet, billing, account, and subscriber records, chat room logs, chat records, membership in online groups, clubs or services, connections to online or remote computer storage, and electronic files;

    iii. Shared images, "friends lists" and "thumbnails"; and

    iv. Financial records, including credit card information.

f. Internet activity and web searches related to the sexual exploitation of children and/or "taboo parenting";

g. Communications over messaging applications and text messages that relate to the sexual abuse of children and undated and/or deleted items;

h. Phone device information and linked accounts that can be used to establish the location and identity of the phone user, including the phone's associated IMEI,

Phone Number, Android or Apple ID and linked user accounts (including user handles and names for internet and social media applications, such as Kik, Google, Facebook, and Instagram);

i.  Evidence of ALBERTSON's ownership and/or use of other wireless phones, tablets and computers, including any devices linked to ALBERTSON's wireless phone (i.e. an iPad);

j.  Records and information that constitute evidence of the state of mind of ALBERTSON, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation;

k.  Records and information relating to the identity or location of perpetrators, aiders and abettors, coconspirators, and accessories after the fact;

l.  Records and information that constitute evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) in the commission of the criminal activity under investigation; or (ii) communicated with ALBERTSON about matters relating to the criminal activity under investigation, including records that help reveal their identity and whereabouts;

m.  Evidence of who used, owned, or controlled the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

n.  Evidence of software, or the lack thereof, that would allow others to control the Device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

o.  Evidence of the attachment to the Device of other storage devices or similar containers for electronic evidence;

p.  Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device;

q.  Evidence of the times the Device was used;

r.  Passwords, encryption keys, and other access devices that may be necessary to access the Device;

s.  Documentation and manuals that may be necessary to access the Device or to conduct a forensic examination of the Device;

t.  Records of or information about Internet Protocol addresses used by the Device(s); and

u.  Records of or information about the Device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the

review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| IN THE MATTER OF THE SEARCH OF: A BLACK SAMSUNG PHONE CURRENTLY LOCATED AT 601 4TH STREET NW, WASHINGTON, DC UNDER RULE 41 |

SW No. 23-282

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Kelly McLeod, being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent with the Federal Bureau of Investigation and have been since September 2019.  I am thus a "federal law enforcement officer" as defined by Fed. R. Crim. P. 41(a)(2)(C). I am currently assigned to a Child Exploitation Task Force at the Washington Field Office, where I am responsible for investigating the possession, distribution, receipt, and production of child pornography, as well as other crimes concerning the sexual exploitation of minors. I was previously assigned to the FBI Washington Field Office Joint Terrorism Task Force, where I worked national security investigations. I have executed search warrants and arrest warrants, seized and searched electronic devices, and exploited electronic devices to obtain evidence. Moreover, I am a federal law enforcement officer who is engaged in enforcing the criminal laws, including violations of 18 U.S.C. § 2422(b), 18 U.S.C. § 2252(a)(2), 18 U.S.C. § 2252(a)(4), and 18 U.S.C. § 2423(a), (e), which relate to the sexual exploitation of minors. As a Federal Agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

2.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property-

digital devices- that are currently in law enforcement's possession (the "DEVICE") as described in Attachment A, and the extraction from that property of electronically stored information as described in Attachment B.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      Unless otherwise specified, all dates set forth below are "on or about" the dates indicated, and all amounts or sums are approximate. Additionally, unless otherwise noted, wherever in this affidavit it is asserted that a statement was made by an individual, that statement is described in substance, and in part, and is not intended to be a verbatim recitation of the entire statement.

5.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 2252(a)(2) have been committed by JOHN ALBERSTON and evidence of those crimes is located on the DEVICE.  There is also probable cause to search the DEVICE, further described in Attachment A, for the things described in Attachment B, and there is probable cause to believe the DEVICE is an instrumentality of the offenses described herein.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6.      The property to be searched is a black in color Samsung cellular phone with SIM card, IMEI: 356044290542610, that was seized from JOHN ALBERTSON upon his arrest on August 23, 2023 in Hebron, Kentucky, hereinafter the "DEVICE". While powered on, the DEVICE display shows an image of a man wearing a white baseball cap backwards, and a

brown-colored dog on a leash. The DEVICE was taken into FBI custody and is currently located at the Federal Bureau of Investigation's Washington Field Office located at 601 4th St NW Washington, DC 20535.

## **PROBABLE CAUSE**

7.     Leading up to Thursday, August 10, 2023, an FBI Washington Field Office (WFO) Task Force Officer (TFO) was acting in an undercover (UC) capacity as part of the Metropolitan Police Department-Federal Bureau of Investigation (MPD-FBI) Child Exploitation Task Force, operating out of a satellite office in Washington, D.C.  In that capacity, the UC entered a private KIK[1] group that the UC has been a member of for several months. Upon entering the group, a rules banner is visible to new members. The rules read as follows:

- State age, sex, location, and children's ages upon entry.

- MUST have a child or a step child to be part of the group

- This is a group for open minded parents/if your not sure what that means your probably in the wrong group.

- MUST HAVE A PFP AND NAME, NO … OR JUST PUNCTUATION BS. Ask before you PM anyone & be respectful (any issues report to the owner or admin)

- Lastly you will need to verify with an admin so PM one of them to get verified. Redacted or Redacted = active admins.

8.     This group is known to the UC as a place where people meet, discuss and trade original images and videos of children, including child sex abuse material.  On Wednesday, August 9, 2023, at approximately 2:03PM EST, an individual using KIK screen name

---

[1] KIK is an instant messaging mobile application where one can transmit and receive messages, photos, and videos. Users can communicate privately with other users or in groups.

"m4kpusc815" joined the KIK group. Upon entering the group, "m4kpusc815" wrote, "33m USA daughter is 7 but I don't have custody. If I did I would have posted a video of us here. Can anyone help me get my little girl back?"

9.      On Wednesday, August 9, 2023, at approximately 2:06pm EST the UC initiated a private KIK chat conversation with KIK user "m4kpusc815," subsequently identified as John Albertson ("ALBERTSON"). The following is a transcript of the private KIK chat:

UC: Hey

UC: Asl

UC: U a dad

UC: This room requires legit verification.

ALBERTSON: 33m USA yes but don't have custody of my daughter. She's 7 and I haven't seen her since she was 2. I went to visit her at her foster parents house and their older girl was naked in the bathroom.

10.      ALBERTSON then sent the UC a video that depicts an adult male rubbing his erect penis on a prepubescent child's bare vagina.  The male can be seen applying some type of lubricant on the child's anus and vagina. Other portions of the video show the adult man's penis in the child's mouth, and the adult man ejaculating into the child's mouth.  The KIK exchange between ALBERTSON and the UC continued, as follows:

UC: That's hot, but that's a random cp vid that's been out for a while.

UC: What u looking for

UC: Where in US? East coast here

ALBERTSON: Indiana. I'm looking for some open minded parents who want to watch me fuck and fill their young daughters so you can film us and sell the videos.

UC: I'm a bit to far, I'm in Virginia DC area

ALBERTSON: I could meet you somewhere in Ohio if you're interested

UC: Let me think about it, I would want gas money to know you are serious or something like that

ALBERTSON: I understand. You aren't a cop or something like that are you? If you're willing to prove that your serious as well by sending me a picture of you and her naked blurred private areas if you want. I just want to know how serious are about me fucking your daughter. I could send you gas money or a digital gas card. Up to you

UC: Ok cool, I will do that for sure. I will have her the week after next. And will do something so u know I'm legit and safe

ALBERTSON: Sounds great to me. I wish I could see her face now… I bet she's gorgeous and sexy and I bet she sucks like a champ. Are you OK with me cumming inside her multiple times? Or would you prefer I cum on her or in her mouth

UC: Probably mouth but we can discuss

11.     The UC then sent ALBERTSON a picture of his purported daughter.[2]  The KIK exchanged continued:

UC: Not a cop I do this to her clothes when she not here lol

12.     In response, ALBERTSON sent the UC a video showing himself masturbating. The KIK conversation continued:

UC: Thanks for the trust

UC: So have u ever played with any young before? What's your situation? Married?

_____

[2] This image did not depict a real child.

ALBERTSON: I kissed a 13 year old girl when I was 26. Would have fucked her but her familt moved. I'm single hoping to find an open minded person to be with and they participate in fucking young girls with me.

UC: Nice!

ALBERTSON: What about you?

UC: Separated with an 8 yo daughter single and very perverted

ALBERTSON: I want to taste her pussy and suck her sweat from her panties while she's playing with me.

UC: Mmmm I would love see that. Where in Ohio

ALBERTSON: 40 minutes outside of Cincinnati towards your way

UC: ok cool

ALBERTSON: I'm thinking we should schedule a hike

UC: 😉

UC: We have time what's your schedule like.

ALBERTSON: Open for the next few days

ALBERTSON: Do you know eastfork?

UC: I'm not familiar with that.

UC: I'm thinking about two weeks if that is good for you

UC: Have to plan things and figure things out

ALBERTSON: Yeah. I do wish we could make it happen today but I understand.

UC: Yeah I wish I could but it a bit far and soon

     13.    On Thursday, August 10, 2023, at approximately 7:54am EST, ALBERTSON initiated a text conversation with the UC using the phone number 513-510-9892. The first

message ALBERTSON sent to the UC depicts an erect penis with the message, "I hope she liked being kissed and licked." During the course of the text exchange, ALBERTSON invited the UC to a KIK group named "Need$$$4cp". The group consists of six KIK users, including ALBERTSON. Upon entering the group, the UC observed a message which reads, "here's proof" followed by a video posted by ALBERTSON that depicts a prepubescent minor female being anally penetrated by an adult male.   Prior to this video being posted to the group another member of the group wrote, "Proof of what."  ALBERTSON responded, "that I have cp."

14.    The following is a portion of the communication that ensued between ALBERTSON and the UC:

UC: Thanks for the invite to the group.

ALBERTSON: Welcome

UC: So u have a lot of Cp, that one was hot

ALBERTSON: I have some. But really want to make some not buy from others. I want to have fun and make xxx money.

UC: mmmm

ALBERTSON: Nice. I've gotten off 3 times since we started talking. I honestly cant wait to meet you both and make this happen.

UC: I'm Jon btw, me too. Really looking forward to it. I only have a few limits with her so let me know exactly what you want to do? And we can go from there.

UC: Let me put it in Waze to see how far it is from me. Like I said I will need help with gas

UC: Can you hold up 3 fingers near your cock so I know that's really u lol

ALBERTSON: I understand. I'm hoping she can suck me off while I'm eating her out and when she gets me really close slip the tip in her and cum. I am also wanting to make love to her but she

might be to small still. I mean anal is an option but that is last resort in my opinion unless you want to watch me fucking her ass.

15.     ALBERTSON then sent the UC an image showing himself holding three fingers near his erect penis.  The chat continued:

UC: Ok, I'll see about that once there, tip may be an option and I am good with the cumming

UC: I am concerned with the filming, just don't want her face exposed for obvious reasons

UC: How you plan to do that?

ALBERTSON: I understand but you can always use filters or a princess mask for Halloween you know the ones that rich ladies hold on a stick lol they have those half masks as well.

UC: Lol, ok cool! I would feel safe with the filters on so she cant be identified

UC: What happened to your kid? and her mom?

ALBERTSON: How would I make love to her? I would lay her down and work my way up from her toes to her pussy and eat it till she cuts then very vary carefully and slowly slide inside her pussy until she says she cant take more and hold it till she gets used to it then start pulling out and pumping into her till we both cum

16.     As the chat continued, ALBERTSON wrote to the UC, "I want to love them and make them feel wonderful and sexy and smart and… wanted… I've never had the courage to say this before but if it was legal I would marry a 10 or 11 year old as long as she started her period she's going to be moody."  ALBERTSON told the UC that he resided near Batavia, Ohio and lived on a farm surrounded by a forest. ALBERTSON suggested to the UC that he and his daughter meet him at his farm and go on a hike in order for them to build trust before they went back to his residence to sexually abuse the UC's purported daughter. During the course of the chat ALBERTSON sent the UC a video to his KIK account. The video depicts what appears to

be a pubescent girl.  In portions of the video the minor has her hand on an adult man's penis.  In other portions, the minor is shown with the man's penis in her mouth.

      17.     On August 14, 2023, the UC asked ALBERTSON to send him an image of himself holding up his thumb near his face. In response, ALBERTSON sent the UC two images. One shows ALBERTSON holding up his thumb near his face, while the other shows ALBERTSON (his face is visible) masturbating. These images appear to depict the same person as the one shown in ALBERTSON's Driver's License picture.

### ADDITIONAL INVESTIGATION AND IDENTIFICATION OF SUSPECT

      18.     Based on a search of Google Maps, the SUBJECT PREMISES is located approximately 26.8 miles southeast of downtown Cincinnati, Ohio. This location appears to be consistent with ALBERTSON's statement to the UC that he lives, "40 minutes outside of Cincinnati towards your way." A search of the Clermont County Auditor's website shows that ALBERTSON's address in New Richmond, Ohio consists of a manufactured home on four acres of land, with the majority of the property consisting of woods. A Google Maps search of this address using a satellite view shows a rural landscape with a structure close to the road, a pond behind the home, and a wooded area beyond that. The Google Maps' Street view shows a manufactured home behind a farm fence line.

      19.     On or about August 13, a subpoena was served to KIK for information affiliated with the account "m4kpusc815". On August 14, 2023, KIK provided the registration email address ksmeet4life33@gmail.com, and the most recent login IP address 65.27.140.60. The logins from this IP address were between August 3, 2023 and August 13, 2023.

20.     On or about August 14th, 2023, a subpoena was served to Google for information associated with the email address ksmeet4life33@gmail.com. On or about August 18, 2023, Google provided IP address logs including recent logins from IP address 65.27.140.60.

21.     On or about August 13, 2023, a subpoena was issued to Charter Communications for records related to IP address 65.27.140.60. On August 14, 2023, Charter Communications provided information that the residential subscriber address for that IP address is 2175 Laurel Lindale Rd New Richmond, Ohio 45157-9627, the SUBJECT PREMISES.

22.     On August 10, 2023, an administrative subpoena was served on T-Mobile requesting subscriber information and call detail records associated with telephone number 513-510-9892 between July 15, 2023, and August 9, 2023. On the same day, T-Mobile provided information that the telephone number 513-510-9892 is not listed in ALBERTSON's name. However, the investigation has revealed that ALBERTSON has a Facebook account. A review of publicly available information on this Facebook accounts shows that ALBERTSON lists his current location as New Richmond, Ohio. The account has several pictures of the user of the account, which appear to depict the same person as the one shown in ALBERTSON's Driver's License picture. On or about August 14, 2023, a subpoena was served to Facebook c/o Meta Platforms Inc. requesting subscriber information associated with profile www.facebook.com/100089757595946. On August 15, 2023, Facebook provided the account registration name "John Albertson" and the phone number 513-510-9892, the one Albertson used to communicate with the UC, as the phone number used to "verify" the account. This phone number is also associated with the email address albertsonjohn01@gmail.com, which was identified as an email address used by ALBERTSON through queries in a database commonly used by law enforcement. In response to a subpoena, Google provided the following subscriber

information:  user John Albertson; subscriber address the SUBJECT PREMISES; phone number 513-510-9892. This Google account has five credit cards tied to the account, all of which are in ALBERTSON's name. IP addresses used to log into this Google account were all associated with the address 2175 Laurel Lindale Rd New Richmond, Ohio 45157-9627, the SUBJECT PREMISES.

23.      On or about August 14, 2023, your affiant received information from ALBERTSON's Probation Officer, who said that she visited ALBERTSON most recently in June 2023 at his residence, the SUBJECT PREMISES.

24.      On August 23, 2023, Federal Bureau of Investigation agents and task force officers executed a search warrant at the SUBJECT PREMISES. ALBERTSON was not present at the time the warrant was executed. An individual living at the residence advised that ALBERTSON had just departed the residence to go to his place of employment. On the same day, FBI agents and local law enforcement officers executed the federal arrest warrant of ALBERTSON in Hebron, Kentucky. The DEVICE was seized from ALBERTSON during a search incident to arrest and taken into the custody of the FBI.

## CHARACTERISTICS OF INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN AND WHO COMMIT CHILD PORNOGRAPHY OFFENSES

1.      The information set forth in this Affidavit—which indicates that ALBERTSON discussed sexually abusing children and possessed and distributed child sexual abuse material using an application on a mobile device and the internet – suggests that ALBERTSON has a sexual interest in children or in sexually explicit images and videos of children. Your affiant's knowledge of these types of individuals and their characteristics is based on your affiant's experience as a law enforcement agent and the training your affiant has received focusing on crimes against children. Based upon such training and experience, as well as upon information provided to me by other law

enforcement officers, your affiant is aware of the following general characteristics, which may be exhibited in varying combinations:

a.      Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children, from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses (such as in person, in photographs, or other visual media), or from literature describing such activity.

b.      Such individuals may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Such individuals oftentimes use these materials for their own sexual arousal and gratification. They may also use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts. With the development of technology, digital devices are used to search for, access, download, possess, receive and distribute these materials. As detailed above, ALBERTSON distributed sexual abuse material to the UC.

c.      This child pornographic material is usually maintained in the privacy and security of their home or some other secure location. Such materials are commonly found on digital devices during the execution of search warrants at people's homes.

d.      Likewise, such individuals often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer or mobile computing devices, including smartphones and tablets. These collections are often maintained for several years and are kept close by, usually at the individual's

residence, or on the individual's person, to enable the individual to view the collection at any time. These individuals often take steps to ensure that other individuals, who do not share their sexual interest in children, cannot access these devices and discover what is contained therein.

      e.     Due to the accessibility and availability of child pornography on the Internet, in your affiant's recent experience, instead of maintaining collections, some such individuals engage in a pattern of viewing or downloading child pornography online and then deleting the material. This conduct also usually occurs at the individual's residence or some other secure location. It is also not uncommon for offenders to commit child pornography violations using only mobile computing devices, such as smart phones and tablets or for these individuals to store these materials in a cloud/online storage account in an effort to avoid law enforcement detection.

      f.     Such individuals also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography. Such items are commonly found on these individuals mobile computing devices. As mentioned above, ALBERTSON was a member of a group known to the UC for distribution of child pornography and was also using a digital application to communicate with an individual that he believed had a sexual interest in children, and who was sexually abusing his own child.

g.      Such individuals prefer not to be without access to child pornography for any prolonged time. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

## TECHNICAL TERMS

36.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.      "Digital device," as used herein, includes the following three terms and their respective definitions:

1)      A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)      "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic,

or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

        b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

        c.      A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen.  Like wireless phones, tablets

function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

    d. A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

    e. "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software

or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

       f.     "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

       g.     Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet. An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

       h.     The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

       i.     "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon

the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

   j. A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

   k. A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly). A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf. The router also distributes to the relevant client inbound traffic arriving from the Internet. A router usually retains logs for any devices using that router for Internet connectivity. Routers, in turn, are typically connected to a modem.

   l. "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations. Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example,

www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

      m.     "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

      n.     "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software. A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network: an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers. One aspect of P2P file sharing is that multiple files may be downloaded at the same time. Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

      i.When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

      ii.     Third party software is available to identify the IP address of a P2P computer that is sending a file. Such software monitors and logs Internet and local network traffic.

o.      "VPN" means a virtual private network. A VPN extends a private network across public networks like the Internet. It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network. This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two. The VPN connection across the Internet is technically a wide area network (WAN) link between the sites. From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network." The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

p.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.      "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems. It can appear in the form of code, scripts, active content, and other software. Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

37.     Based on my training, experience, as well as personal experience utilizing similar devices, I know that the DEVICE, a Samsung cellular phone, has capabilities that allow it to serve as a storage device for digital media, as well as a device used to transmit and send encrypted messages and content via mobile messaging applications. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offense(s) under investigation.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

38.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the DEVICE, in whatever form they are found. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the DEVICE for at least the following reasons:

a.     Individuals who engage in criminal activity, including the Target Offense, use digital devices like the DEVICE to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like the DEVICE, documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers,

and social security numbers of other individuals; and records of illegal transactions using stolen financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; and (2) plan coordinated activities.

        b.   Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

        c.   Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less

on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

39.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often

store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computers, smart phones, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.     Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.     A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed

along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

        e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

        f.      I know that when an individual uses a digital device to conspire with others to commit the Target Offenses, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of a crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of

internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

40.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment and can require substantial time.

d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the

printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

e.       Analyzing the contents of mobile devices, including tablets, can be very labor intensive and can require special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio

application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

     f.   Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

     41.   In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

     a.   The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

     b.   The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning"

storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

    c. In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the Device(s) will be specifically chosen to identify the specific items to be seized under this warrant.

## AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

    42. Because forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## CONCLUSION

    43. I submit that this affidavit supports probable cause for a warrant to search the DEVICE described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

_____
Kelly McLeod
Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on August 30, 2023.


_____
HONORABLE ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE